J-S03006-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| HORACE L. JACKSON, | |
| Appellant | No. 811 EDA 2017 |

Appeal from the Judgment of Sentence Entered February 2, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0011377-2015

BEFORE:  BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MAY 01, 2018**

Appellant, Horace L. Jackson, appeals from the judgment of sentence

entered after a jury convicted him of robbery and related crimes.  We affirm

in part and reverse in part.

The trial court aptly summarized the procedural history and factual

background of this case as follows:

**Procedural History**

> On August 15, 2016, a hearing was held on Appellant['s]
> motions to suppress identification and statements.  Those motions
> were denied following that hearing.

> Appellant then proceeded to trial before this [c]ourt, sitting
> with a jury.  Testimony commenced on August 16, 2016.  On
> August 22, 2016, the jury returned a verdict of guilty on the
> charges of robbery as a felony of the first degree (18 Pa.C.S. §
> 3701([a]), possession of an instrument of crime [(PIC)] (18

_____

[*] Former Justice specially assigned to the Superior Court.

Pa.C.S. § 907), attempted theft (18 Pa.C.S. § 901) and attempted receipt of stolen property (18 Pa.C.S. § 901).

On February 2, 2017, Appellant was sentenced to 10-20 years['] incarceration on the [r]obbery conviction and a consecutive 5 years['] probation on the conviction for [PIC]. No further penalty was imposed on the charges of attempted theft and attempted receipt of stolen property.

A timely Notice of Appeal was filed by Appellant, *pro se*, on February 6, 2017.[1] Counsel filed a Notice of Appeal on March 6, 201[7].

[1] On that same date[,] Appellant also filed a *pro se* petition under the Post[]Conviction Relief Act[, 42 Pa.C.S. §§ 9541-9546]. That petition was dismissed as premature on March 15, 2017.

Pursuant to Pa.R.A.P. 1925(b)(2) and (3), the [c]ourt entered an order on March 16, 2017, directing the filing of a Statement of Errors Complained of on Appeal, not later than twenty-one (21) days after entry of the order.

A timely Rule 1925(b) Statement of Errors was filed by appointed appellate counsel on April 1, 2017.

**Factual History**

*Motion to Suppress*

Appellant moved to suppress his out-of-court and in-court identification based upon lack of reasonable suspicion to detain him for the on-the-street confrontation, suggestivity of the out-of-court identification and attendant unreliability of the in-court identification. Appellant also sought suppression of his statement to detectives, arguing that his waiver of rights under ***Miranda***[2] was not knowing and voluntary because he was visibly under the influence of a controlled substance -- PCP. [Testimony was taken] from Jesse Weller, one of the complainants, and Officer Anthony Woltman, the officer who responded to the scene and broadcast[ed] the descriptive ("flash") information, who later responded to the location where Appellant had been stopped, who was present for the identification and who identified a photo taken of Appellant at the time of the identification. Officer Woltman also prepared a 75-48 (Incident Report). Detective Kevin Sloan then

- 2 -

testified to the circumstances of the taking of Appellant's statement.

> [2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Appellant then testified as to the circumstances of the stop, the identification on the street and his statement to detectives. There was also a stipulation that Officers Covello and Carroll prepared an arrest memo, that they stopped Appellant based on flash information, at the time he was stopped he had a black hat hanging from his pocket, and he was identified by the complainant. Appellant also introduced the Computer Assisted Dispatch (CAD) and his color arrest photo.

***[1]

### *Trial*

On October 27, 2015, Paul Ravenscraft and Jesse Weller were making a truck delivery of goods to the Family Dollar Store at 5200 Germantown Avenue. The[y] arrived at about 4:30 AM, before the store employees. Ravenscraft took off his glasses and napped in the cab of the truck, while Weller remained in the rear of the semi-truck scanning items and preparing the delivery.

At approximately 5:30 AM, Appellant approached the rear of the truck and spoke briefly with Weller, who was inside, before leaving. Appellant was wearing a distinctive green, white and black jacket, also described as a jump suit. A short time later, Appellant returned, demanding that Weller hand over money and threatened to shoot Weller. During this exchange[,] Appellant kept his hand down at his side, as though he had a gun. Weller was unable to make out what Appellant was holding. Appellant repeatedly threatened to shoot Weller. Eventually, Appellant tried to climb into the truck. Weller concluded that the object was not in fact a gun, so he grabbed a bar used for securing products for delivery and threat[en]ed Appellant with it. Appellant withdrew,

---

[1] As mentioned *supra*, the trial court denied Appellant's motions to suppress identification and statements following the suppression hearing. **See** Trial Court Opinion (TCO), 6/27/2017, at 1, 3-6. The trial court thoroughly outlined its findings of fact and conclusions of law with respect to Appellant's suppression issues in its opinion, which we have omitted from the summary above in the interest of brevity. **See id.** at 3-6.

- 3 -

then went to the front of the truck, as Weller proceeded to call 9-1-1.

Appellant approached the cab of the truck where Ravenscraft was sleeping. Appellant opened the door and demanded money. As Appellant started to enter the cab, Ravenscraft fled out the other door and ran past the rear of the truck. He also called 9-1-1.

Police responded to the scene, took information from the complainants, and put out flash information describing Appellant. Appellant was stopped over a mile away. Weller was brought to that location, where he identified Appellant as the person who had attempted to rob him and Ravenscraft. Appellant was wearing the distinctive jacket, which was secured by detectives, placed into evidence at trial and identified by Weller.

Appellant was transported to the detective division where he gave a statement admitting to being on the scene at the Family Dollar Store and interacting with Weller and Ravenscraft. A photo was taken of Appellant wearing the jacket in question. Appellant also had a black hat and a bag with a black strap.

TCO at 1-3, 6-7 (internal citations omitted).

Appellant presently raises the following issues for our review, which we have reordered for ease of disposition:

A. Did the trial court err in denying [A]ppellant's pretrial motion to suppress his statement as it was not given knowingly, voluntarily, or intelligently, as [A]ppellant was under the influence of [Phencyclidine (PCP)] at the time and the *Miranda* Warnings were not properly given and seemingly given after the statement was given?

B. Was the evidence … insufficient to sustain guilty verdicts for robbery and [attempted] theft as there was no serious attempt to commit any theft and nothing was taken?

C. Was the evidence insufficient to sustain the guilty verdict for [PIC] as no item whatsoever was used to commit a crime?

Appellant's Brief at 7 (unnecessary emphasis omitted).

- 4 -

First, Appellant argues that "[t]he trial court erred in denying [A]ppellant's pretrial motion to suppress his statement as it was not given knowingly, voluntarily, or intelligently, as [A]ppellant was under the influence of [PCP] at the time and the *Miranda* Warnings were not properly given and seemingly given after the statement was given." *Id.* at 17 (unnecessary emphasis omitted). Without any citation to the record, he asserts that "the detective either purposely or in error failed to Mirandize [A]ppellant before interrogating him[,]" and he claims this failure "was compounded by [A]ppellant's being under the influence of PCP and marijuana." *Id.* at 18, 19. Consequently, he avers that "there was no waiver of any *Miranda* rights, and even if there [was], it was not knowingly and intelligently done." *Id.* at 19.

> Initially, we set forth our standard of review for suppression rulings:
>
> [W]e determine whether the court's factual findings are supported by the record and whether the legal conclusions drawn from them are correct. Where, as here, it is the defendant who is appealing the ruling of the suppression court, we consider only the evidence of the prosecution and so much of the evidence for the defense which remains uncontradicted when fairly read in the context of the whole record. If, upon our review, we conclude that the record supports the factual findings of the suppression court, we are bound by those facts, and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Mitchell*, 902 A.2d 430, 450-51 (Pa. 2006) (citation and original brackets omitted).

We acknowledge that, "[a]s a general rule, the prosecution may not use statements, whether inculpatory or exculpatory, stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of

his right against self-incrimination and his right to counsel." ***Commonwealth v. Venture***, 975 A.2d 1128, 1136 (Pa. Super. 2009) (citations omitted). Further, "[w]hen evidence of impairment is present, it is for the suppression court to decide whether the Commonwealth has established by a preponderance of the evidence that the suspect nonetheless had sufficient cognitive awareness to understand the ***Miranda*** warnings and to choose to waive his rights." ***Id.*** at 1138 (original brackets, citation, and footnote omitted).

In the case *sub judice*, the trial court ascertained that "when [Appellant] gave a statement, he made a knowing and voluntary waiver of his right to remain silent and his right to an attorney and … he gave a knowing and voluntary waiver up until the point that he decided that he wanted counsel." ***See*** TCO at 6 (citation to record omitted). Thus, it concluded that "the statement was not the product of any coercion or the product of [Appellant's] intoxication as he contends." ***Id.***

Our review of the record shows that Detective Sloan testified to the following:

> [The Commonwealth]: And before taking the statement from [Appellant], did you read him his ***Miranda*** warnings?
>
> [Detective Sloan]: I did.
>
> [The Commonwealth]: And did he agree to speak with you?
>
> [Detective Sloan]: He did.
>
> ***

[The Commonwealth]: Do you remember what the -- [Appellant's] appearance at the time that you took the statement?

[Detective Sloan]: I do not recall.

[The Commonwealth]: Do you remember if the -- did [Appellant] -- could you describe his condition in terms of how he was answering questions?

[Detective Sloan]: There was no problem. It was just -- I asked him a question, he would answer it. And then at the end[,] he said he would rather have a lawyer and he did not want to sign the statement.

[The Commonwealth]: Did he appear alert at the time that you took the statement?

[Detective Sloan]: Yes.

[The Commonwealth]: Did he have any difficulty giving you his full name, date of birth and address to one of the questions in the statement?

[Detective Sloan]: No, he didn't have a problem answering any of my questions.

[The Commonwealth]: And by any of the questions -- any of those preliminary questions, he did not have a problem answering other basic biographical information?

[Detective Sloan]: That's correct.

***

[The Court]: Did he seem intoxicated to you in any way?

[Detective Sloan]: He did not.

[The Court]: Did he seem mentally deficient to you in any way?

[Detective Sloan]: No.

***

[Appellant's attorney]: You didn't notice that when he was sitting there, his eyes were red and he was [as] high as a kite?

[Detective Sloan]: He did not appear intoxicated to me.

[Appellant's attorney]: You didn't see his eyes were red? I didn't say intoxicated.

[Detective Sloan]: I don't remember if his eyes were red but he did not appear under the influence.

[Appellant's attorney]: How long [have] you been on the job?

[Detective Sloan]: Sixteen years.

[Appellant's attorney]: And you can tell when somebody is high on something other than alcohol. Can we agree?

[Detective Sloan]: Yes.

[Appellant's attorney]: And [Appellant] didn't appear to be high, as you say?

[Detective Sloan]: He did not.

[Appellant's attorney]: Didn't he tell you that he smoked PCP and weed when you started asking him those questions?

[Detective Sloan]: No, he did not.

[Appellant's attorney]: Isn't that why he said, "I want to talk to an attorney now because I'm high and I was smoking weed[]?["]

[Detective Sloan]: I said, "Are you" -- one of the first questions I asked him was: "Are you now under the influence of drugs or alcohol," and his answer was, "No."

N.T. Suppression, 8/15/2016, at 66, 68-69, 70, 74-75.

With respect to this testimony, the trial court found Detective Sloan credible, and found that "Appellant did not testify credibly regarding the circumstances of the *Miranda* warnings and waiver." *See* TCO at 14 (citation to record omitted). Detective Sloan's testimony establishes that Appellant had sufficient cognitive awareness to understand the *Miranda* warnings, and waived his rights before questioning. Accordingly, we deem the trial court's factual findings to be supported by the record, and its legal conclusions drawn

therefrom to be correct.  ***See Mitchell, supra.***  As such, the trial court did not err in denying Appellant's pretrial motion to suppress his statement.

Second, Appellant asserts that "[t]he evidence was insufficient to sustain guilty verdicts for robbery and [attempted] theft as there was no serious attempt to commit any theft and nothing was taken."  Appellant's Brief at 13 (unnecessary emphasis omitted).  We apply the following standard of review to claims challenging the sufficiency of the evidence:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.  Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Scott***, 146 A.3d 775, 777 (Pa. Super. 2016) (citation omitted).

We recognize that "[a] person is guilty of robbery if, in the course of committing a theft, he … threatens another with or intentionally puts him in fear of immediate serious bodily injury[.]"  18 Pa.C.S. § 3701(a)(1)(ii).  "An act shall be deemed 'in the course of committing a theft' if it occurs in an

- 9 -

attempt to commit theft or in flight after the attempt or commission." 18 Pa.C.S. § 3701(a)(2). Moreover, a person commits attempted theft by unlawful taking when he attempts to "unlawfully take[], or exercise[] unlawful control over, movable property of another with intent to deprive him thereof." *See* 18 Pa.C.S. § 3921(a); 18 Pa.C.S. § 901.

Here, Appellant advances that the evidence was insufficient to sustain his convictions for those offenses because his "threats could not reasonably have been taken seriously" under the circumstances. Appellant's Brief at 16. Although he seems to concede that the evidence presented shows that he had demanded money from Mr. Weller and Mr. Ravenscraft, and had threatened to shoot Mr. Weller, he maintains that "[n]either [man] seemed truly troubled or truly threatened by the actions of [A]ppellant, and at most were bothered, perplexed, and confused by their exchange with the high [A]ppellant." *Id.* at 10; *see also id.* at 15.

This Court has previously explained that "[w]hen determining whether a victim has been placed in fear of serious bodily injury, this Court uses an objective standard; therefore, [the victim's] subjective state of mind during the robbery is not dispositive." *Commonwealth v. Kubis*, 978 A.2d 391, 398 (Pa. Super. 2009) (citation omitted). In other words, "this Court will look to the nature of the defendant's threats, and not the subjective state of mind of the victim." *Id.* (citation omitted).

Here, Mr. Weller gave the following testimony at trial regarding his interaction with Appellant:

[The Commonwealth:] When you say "attempted robbery," start where you think is appropriate and just tell the jury what happened.

[Mr. Weller]: I was scanning the product in the back of the truck when a guy walked up to the back and stuck his head in the back of the trailer, which is normal.  It happens every now and then.  I asked him how it's going and he just said, "Good," and walked away.

A couple minutes later, he came back and said "Give me all the money," and I repeated, "I don't have any money; we don't have any money, just get out of here."  And then it escalated to, "Give me all the money or I'm going to shoot you," and exchanging back and forth, "I don't have any money; we don't have any money, just get out of here, just get of here."  And it escalated to, "Give me your wallet."  I said, "I'm not giving you my wallet."

"Give me your cell phone."

"I'm not giving you my cell phone."

"Give me all the money or I'm going to shoot you."  Over and over again.  Back and forth.

And then he attempted to crawl into the back of the trailer, and I had this big, metal load bar on my left-hand side next to me and I grabbed it and just shook it.  And he said, "What are you going to do, hit me with it?"  I said, "No, just get out of here.  Go.  Go away."  And I said, "My partner is up front, go bother him."  So eventually he left.  He said he was going to go up front and [was] trying to get something from him and immediately, I called the police.

***

[The Commonwealth:] Okay.  And when he first told you that he was going to shoot you, what did you think at that time?

[Mr. Weller]: It's nothing you expect to hear, and it's nerve-racking.  I don't want to go anywhere near him.  That's why I stayed where I was in the back of the trailer.

[The Commonwealth:] Did you, in fact, see a gun?

[Mr. Weller]: I [saw] something that could have been a weapon but I wasn't sure at the moment of what it was.

- 11 -

> [The Commonwealth:] And that's something that you think could have been a weapon. Could you describe where it was on [Appellant] and how [he] was holding that item?
>
> [Mr. Weller]: Being that I was in the trailer, I was higher than him and he was standing on the ground because the ramp under the back of the truck was not out so he was about chest-level, maybe a little bit higher to the back of the trailer. He kept his right arm down at his side the whole time. He was holding something black in his hand, so I assumed it was -- that's what he was threatening with.

N.T. Trial, 8/17/2016, at 42-43, 44-45.

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we deem the evidence sufficient to sustain Appellant's convictions for robbery and attempted theft. With respect to robbery, Appellant demanded Mr. Weller's money, wallet, and cell phone, while threatening to shoot him. Even if Mr. Weller eventually realized that Appellant did not have a gun and did not take his threats seriously, as Appellant contends,[2] Appellant's threat to shoot him constituted a threat of immediate serious bodily injury, and intentionally put Mr. Weller in fear of such. **See** 18 Pa.C.S. § 3701(a)(1)(ii); **see also Kubis, supra**. Further, regarding his attempted theft conviction, Appellant's demand for money and other items clearly establishes an attempt to unlawfully take the property of another with intent to deprive him thereof. **See** 18 Pa.C.S. § 3921(a); 18 Pa.C.S. § 901.

_____

[2] We note our disagreement, though, with Appellant's contention that Mr. Weller did not take his threats seriously. Mr. Weller testified that the encounter was "nerve-racking[,]" that he didn't "want to go anywhere near [Appellant,]" and that Appellant's threats "raised the adrenaline." N.T. Trial at 44, 49.

- 12 -

Accordingly, the evidence was sufficient to sustain Appellant's robbery and attempted theft convictions.

Finally, Appellant advances that "[t]he evidence was insufficient to sustain the guilty verdict for [PIC] as no item whatsoever was used to commit a crime." Appellant's Brief at 16 (unnecessary emphasis omitted). He claims he "was not in possession of any gun; was not in possession of any simulated firearm or toy gun; was not in possession of any knife; was not in possession of any weapon; was not in possession of any object that even looked like a weapon." *Id.* at 17. Instead, he says "[t]he only evidence was that [A]ppellant had a black object in his hand that really did not look like a gun." *Id.* at 11.

A person commits the offense of PIC where "he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a). Instruments of crime include "[a]nything specially made or specially adapted for criminal use[,]" or "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S. § 907(d).

The trial court explained why it believed the evidence was sufficient to support Appellant's conviction for PIC, as follows:

> Here, the instrument was [A]ppellant's hat, which he rolled up and held at his side in an attempt to have it appear to Jesse Weller that it was a gun. Thus, while a hat certainly has lawful purposes, where, as here, it is used to simulate a gun in furtherance of a robbery, the hat constitutes an instrument of a crime. In this respect, it is no different from a toy gun. *See Commonwealth v. Brown*, 23 A.3d 544, 561 (Pa. Super. 2011) ("The lawful uses

- 13 -

of a toy gun do not include utilizing it in a robbery, particularly where it is obviously used to convey the impression that it is a real gun[.]"). *See also Commonwealth v. Brunson*, 938 A.2d 1057, 1062[] (Pa. Super. 2007) (a plastic soda bottle can constitute an instrument of a crime).

TCO at 12.

Although the Commonwealth points out that it did not assert during closing argument or at sentencing that it was specifically a hat that Appellant rolled up and passed off as a firearm, it similarly claims that the evidence was sufficient to sustain Appellant's PIC conviction because Appellant "was in possession of a black object that he attempted to pass off as a gun in order to threaten Mr. Weller…." Commonwealth's Brief at 13 (citations to record omitted). In particular, while making threats to Mr. Weller, the Commonwealth says Appellant "held a black object down by his side, in a manner that made Mr. Weller initially believe that [Appellant] was holding a gun." *Id.* at 12. To support its argument, the Commonwealth likewise cites to *Brown* and *Brunson*. *See id.* at 13.

We deem *Brown* and *Brunson* distinguishable. In *Brown*, the appellant "pulled a gun out of a brown plastic bag and pointed it at [a gas station cashier's] face. Throwing her a white plastic bag, [the appellant] demanded that [the cashier] give him money and threatened to kill her if she did not." *Brown*, 23 A.3d at 547. After the cashier yelled for her manager and the manager appeared, the appellant ran out of the store. *Id.* Police later discovered that the gun that the appellant used in the robbery "was actually a toy gun colored in with a black magic marker, with its barrel taped."

*Id.* at 548. A jury subsequently convicted the appellant of, *inter alia*, robbery and PIC. *Id.* at 547, 548. On appeal, the appellant argued, among other things, that the evidence was insufficient to convict him of PIC. *Id.* at 559. This Court rejected that argument, reasoning, "The lawful uses of a toy gun do not include utilizing it in a robbery, ***particularly where it is obviously used to convey the impression that it is a real gun***." *Id.* at 561 (emphasis added). We further noted that the cashier's "testimony that [the appellant] pointed the gun at her face and demanded money is sufficient to establish that [the appellant] possessed the instrument of crime for the purpose of employing it criminally." *Id.*

Additionally, in **Brunson**, the following facts were adduced at trial:

On July 22, 2004, at around midnight, the [victim] was standing near his vehicle waiting for his daughter when [the a]ppellant approached him and asked whether the [victim] was "hacking."[2] The [victim] indicated "no," that he was just waiting for his daughter. [The a]ppellant indicated he wanted to be driven to a nearby location, and the [victim] agreed to drive him to the desired location in exchange for $5.00. While they were driving, [the a]ppellant indicated he only had a twenty dollar bill and would need change. The [victim], who had only a single five dollar bill, said he would need to stop for change. In response, [the a]ppellant suggested the [victim] give [the a]ppellant the five dollar bill, and [the a]ppellant would then give the [victim] the twenty dollar bill. Upon arriving at [the a]ppellant's destination, the [victim] told [the a]ppellant that he didn't have to pay for the ride and the [victim] had to get going in order to meet his daughter. [The a]ppellant suddenly grabbed the [victim's] neck with one hand and demanded the [victim] give him the five dollar bill. The [victim] noticed that [the a]ppellant was holding something white in his left hand, and he began struggling with [the a]ppellant. The white item, which [the a]ppellant was holding, fell to the vehicle's floor. [The a]ppellant began punching the [victim] in the head, and the [victim] raised his arm to defend

himself. [The a]ppellant repeatedly threatened to kill the [victim] if he did not give him the five dollar bill and threw the vehicle's keys out of the window. At this point, the [victim's] "heart started pounding like he might have a heart attack and [the appellant] might have killed me." The [victim] then opened the vehicle's door, and while he was exiting, [the a]ppellant attempted to take the [victim's] wallet out of his pocket. The [victim] ran across the street, and [the a]ppellant began searching the vehicle, including an area between the seats and the glove box. [The a]ppellant tore off the vehicle's rearview mirror, exited the vehicle, and threw a plastic Pepsi Cola bottle at the [victim]. The bottle missed its intended target, and the [victim] ran, with [the a]ppellant right behind him. The [victim] dialed 911 on his cell phone, and the police arrived within a minute and a half. The [victim] informed the police that [the a]ppellant had run into a nearby building. As a result of the attack, the [victim] suffered torn ligaments in his right shoulder, for which surgery has been recommended.

> [2] "Hacking," which is illegal, is used to describe people who drive others in exchange for money. As the trial court noted in its opinion, [the victim] admitted at trial that he sometimes "hacks" to help elderly people.

**Brunson**, 938 A.2d at 1058-59 (internal citations and original brackets omitted).

The appellant in **Brunson** was convicted of robbery, attempted theft, PIC, making terroristic threats, simple assault, and recklessly endangering another person. **Id.** at 1058. On appeal, he contested, *inter alia*, the sufficiency of the evidence underlying his PIC conviction. **Id.** This Court concluded that the evidence was sufficient, explaining:

[The a]ppellant contends that the soda bottle, which he threw at [the victim], cannot be an "instrument of crime" since it was made of harmless plastic.[6] Essentially, [the a]ppellant argues that, before an item can qualify as an "instrument of crime" under Section 907, the Commonwealth must demonstrate that the item could cause harm.[7] Our plain reading of the statute reveals no such requirement and, since [the a]ppellant has cited no case law

- 16 -

supporting his interpretation of the statute, we find no relief is due.

> [6] There was no evidence presented as to whether the bottle contained any liquid or was empty.

> [7] We find it unnecessary to address [the a]ppellant's contention the plastic soda bottle was incapable of causing harm.

*Id.* at 1062.

In the case at bar, Mr. Weller gave the following testimony:

[The Commonwealth:] And during that time, [Appellant] said -- you stated that [Appellant] threatened to shoot you. Did [Appellant] make that threat additional times or did he just threaten to shoot you one time?

[Mr. Weller]: Multiple times. I'd say, maybe a dozen times.

[The Commonwealth:] During those times that he said it multiple times, did he continue to hold his right hand with the object down by his side?

[Mr. Weller]: Yes.

[The Commonwealth:] What made you think -- based on what you described you observed, what made you think that that was the weapon or that [it] could be the weapon?

[Mr. Weller]: Being that it was black and he wasn't showing it.

[The Commonwealth:] Now, did there ever come a time during this entire interaction with [Appellant] that you get closer to [Appellant]?

[Mr. Weller]: Yes. I was curious to see what actually was in his hand. I kept edging closer, little by little.

[The Commonwealth:] And what did you learn, as far as your observations of that particular object in his hand?

[Mr. Weller]: I'm familiar with guns and from what I [saw], it didn't look to be a gun but I still was not sure.

* * *

[Appellant's attorney]: You said -- and correct me also if I got it wrong, during your exchange with [the Commonwealth] on direct [examination], you said you were slowly moving towards the front of the truck because you were curious to see what was in [Appellant's] hand. Did I get that right? Just a summary, paraphrasing … what you said.

[Mr. Weller]: Correct.

[Appellant's attorney]: And even though when you got close, you still couldn't, as you said now, tell what it was. You knew it wasn't a gun, can we agree, because you know guns? You said that, right?

[Mr. Weller]: Yes, I do know guns. I still wasn't sure but I was more comfortable with seeing what was in his hands. Guns come in all shapes and sizes. I still wasn't okay with walking up to him and getting any closer to him.

[Appellant's attorney]: Fair enough. That's fair. But you knew it wasn't a gun or a weapon, you knew that at that point?

[Mr. Weller]: No, I did not. I did not know it was not a weapon.

[Appellant's attorney]: It didn't look like a gun, did it?

[Mr. Weller]: No.

[Appellant's attorney]: And you knew that, right?

[Mr. Weller]: There's always that chance.

[Appellant's attorney]: That's not my question, sir. Please answer my question. You knew it didn't look like a gun, right? That's all I'm asking you.

[Mr. Weller]: Yes.

[Appellant's attorney]: *Why did you tell 9-1-1 he had a gun then?*

[Mr. Weller]: *Because he was telling me he was going to shoot me.*

\*\*\*

[Appellant's attorney]: *When you told 9-1-1 he had a gun, it was based on what he said to you but not what you saw, is that what you're telling us?*

- 18 -

[Mr. Weller]: **Yes.**

N.T. Trial at 45-46, 94-95, 95 (emphasis added).

Unlike the appellant pointing the toy gun at the cashier in ***Brown***, Mr. Weller's testimony at trial did not establish that Appellant did anything to actively simulate or give the impression that he had gun. Instead, Mr. Weller supposed that the object in Appellant's hand was a weapon because of his threats to shoot. Mr. Weller explained that Appellant "kept his right arm down at his side the whole time. He was holding something black in his hand, so I ***assumed*** it was -- that's what he was threatening with." ***Id.*** at 45 (emphasis added). Moreover, in contrast to the appellant's throwing the bottle at the victim in ***Brunson***, Appellant did not take any action with the object — he merely held it in his hand by his side. Furthermore, the record does not establish that Appellant was purposely hiding or obscuring the object from Mr. Weller's view. Instead, it appears that Mr. Weller had trouble seeing the object in Appellant's hand because Appellant's position happened to be "chest-level, maybe a little bit higher to the back of the trailer[,]" and Mr. Weller was at least 10 feet back in the truck's trailer when he initially spotted an item in Appellant's hand. ***Id.*** Consequently, Mr. Weller "was curious to see what actually was in his hand" so he "kept edging closer, little by little." ***Id.*** at 46. In addition, unlike the issue in ***Brunson***, Appellant's argument is not limited to whether the Commonwealth demonstrated that the object — whether a hat or something else — could cause harm. Rather, the crux of Appellant's argument is that "no item whatsoever was used to commit a crime."

Appellant's Brief at 11 (unnecessary emphasis omitted). Based on Mr. Weller's testimony, we agree that Appellant did not use any object for a criminal purpose and, therefore, we reverse Appellant's conviction of PIC.

Judgment of sentence for PIC reversed. Judgment of sentence affirmed in all other respects. Jurisdiction relinquished.

Judge Panella joins this memorandum.

President Judge Emeritus Stevens files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/1/18